All right. The next case this morning will be 25-1113, Garrison Property and Casualty v. Horton, counsel for appellant. I understand you're gonna try to split your time, is that right? We're gonna attempt it. Okay. If you'll make the first counsel for appellant, if you'll make your appearance and proceed, please. May it please the court. Good morning, your honors. My name is Michelle Cortez and I represent appellant Nicholas Horton. Let me explain the injustice that occurred in this case which we asked this court to remedy. The district court rewarded USA and Garrison for their egregious conduct when it granted them summary judgment finding no conflict between exclusion B-1 and the non-owned vehicle exceptions. That was error. For this contention, the district court claimed the non-owned vehicle exceptions only pertain to ownership and use. But that's not true. There's five factors under the non-owned vehicle exceptions. Ownership, use, family member, that it be primarily insured by another carrier and most importantly here, and what the district court ignored, is that it be a vehicle. Now that term vehicle was chosen by USA and Garrison and it's a very broad term. They also chose not to define vehicle even though they could have. So when we give effect to the term vehicle as the district court should have done, that shows the conflict in the policy. So what is the conflict? Exclusion B-1 avoids coverage for a vehicle which all parties agree is a motorcycle, includes a motorcycle. So exclusion B-1 avoids coverage for a motorcycle not listed on the declarations. But the non-owned vehicle exceptions restore coverage for a non-owned motorcycle not listed on the declarations. Those provisions conflict, meaning they're internally inconsistent and under established longstanding Colorado law under Simon, Neeson, Collard, and Worsham, the conflicting exclusion must fall and the policy must be construed in favor of coverage for the insured here, Horton. This is supported by USA and Garrison's own interpretations of coverage. They had an adjuster who said, we are affording coverage. They had in-house counsel that said that there is coverage under the non-owned vehicle exceptions. They even certified to the Colorado Insurance Commissioner that they were expanding their policy to provide non-owned vehicle coverage. That is their own term, non-owned vehicle coverage. So this is consistent with Neeson versus State Farm in which the court supported its finding of coverage by State Farm's own interpretation, finding coverage for the other victims of the crash. In Simon, however, were not the provisions that led the court to believe, the Colorado Supreme Court to believe that there was a basis for confusion. They both related to warranties, right? Sort of, Your Honor, but it wasn't that clear when you look at it on its face. So there was an exception, restoring coverage for warranties. Then there was an exclusion for what's called completed operations. When you look at that on its face, you may not think those provisions conflict. It wasn't until completed operations was defined, which is defined as in part warranties, then you see the conflict between warranties. I'm sorry, go ahead. Would you agree in that case, the court found that that was a conflict that was irreconcilable? Correct. Now in this case, is it your position that the issues here, the conflict that you're raising is irreconcilable, meaning that the various exclusions and the exceptions, there's no way to read those in such a way that there's not a conflict? Correct, Your Honor, because they both... Why wouldn't they, with regard to exclusion B-1, why wouldn't they put the same language in the exception to B-2? And why does it say on the exception to B-2, why does it specifically say with regard to exclusion B-1? And the same with B-3. It says the exception with regard to exclusion B-3. I mean, it says that specific language in those paragraphs, right? Let me make sure I understand the question, that the exception to B-2 says this exclusion does not apply in the B-2 language. The only thing I can understand about that is that these exclusions and exceptions were added to the policy at different times, and so there's different language, but there's nothing in the policy that says that B-1 controls B-2. But you're trying to apply an exception, which is set forth in B-2, you're trying to apply that to B-1, right? Incorrect, Your Honor. That is a red herring that USA and Garrison have raised. Those are just exceptions under B-2 and B-3. The issue is, do they conflict with B-1? Because the policy language does not say B-1 and B-2 and B-3 have to be met. There's no word and between them. Adding that word. Right, but there's no and for the exclusions either. You have one exclusion, you're excluded, right? Correct, but under Colorado law, if they conflict, and this is something that is unique to Colorado law, it is a cornerstone principle of insurance law in Colorado. If they conflict, the one doesn't still control. The conflicting exclusion falls. So in this case, because the exceptions to B-2 and B-3 restore coverage, and because they conflict with exclusion B-1, B-1 falls and does not control and coverage must be construed in favor of the insured Horton. But if the exceptions to B-2 and B-3 apply to B-2 and B-3, what is the predicate for the conflict, for conflicting basis? I mean, what's the conflicting basis? If they apply to their provisions, I think that's what Jez Haya was talking about. The problem with the district court, the problem that I think the district court had was that it was an overgeneralization of what the exclusions were about, but it was not a full analysis of all the factors. Under exclusion B-1, do you agree that a motorcycle was excluded from coverage? That's correct, Your Honor. So the issue is, how do the exceptions in B-2 and B-3 change that? If it wasn't on the deck sheet, it was excluded from coverage, and that is a key provision. Now, B-2 and B-3, which were added later, which make the policy internally inconsistent, restore coverage for a non-owned motorcycle, not just a motorcycle, a non-owned motorcycle that's not on the deck sheet. So because the non-owned motorcycle is restored that's not on the deck sheet, that conflicts. And it makes- That's the point I was trying to get at earlier. It seems to me that Simon was dealing with apples and apples. Here, you're not dealing with apples and apples. B-2 goes to, the distinction B-2 draws is on ownership. The distinction B-1 draws is on the nature of the vehicle. And therefore, whereas in Simon, they were both dealing with warranties. So one could read into that a potential for confusion. Here, you've got B-2 and B-3 talking about the basis of the vehicle ownership, B-1 talking about the nature of the vehicle. Why would there be any basis for conflicting understanding of those? Your Honor, let me answer this question then I probably need to sit down. So the term that is the key here is the term vehicle. There is no restriction on the number of wheels of that vehicle under B-2 and B-3. Now they could have said, we restore coverage for non-owned cars. Or they could have said, we restore coverage for non-owned autos and define that as a four-wheel car. They specifically chose non-owned vehicles and certified vehicles to the Colorado Insurance Commission. So you're saying the basis for conflict exists in the fact that B-1 talks about vehicles and the word vehicle appears in B-2 and B-3? And the issue of it not needing to be on the deck sheet, Your Honor. Is there any issue with regard to, how does reliance play into this? How does reliance play into this? Was there any reliance on that conflict? Your Honor, I think that the conflicting interpretations of USA and Garrison over many years show that they did not know how their provisions operated together. And I understand that Ms. Abeyta relied on USA and Garrison's representations when she filed suit against Horton regarding coverage. But as, I mean, the record is pretty clear that Mr. Horton didn't rely on that. Mr. Horton relied on USA and Garrison being up front with him and treating him as a quasi-fiduciary, which they did not when they, when they didn't raise coverage timely. For five years, USA and Garrison didn't raise coverage. And that is prejudice as a matter of law. And I apologize for stuttering. I'm just worried about the time, if I could pass it over. Thank you. All right, thank you. Morning, Your Honors. Michael Rosenberg here on behalf of Tashira Abeyta. March 13th will be the eighth anniversary of this horrible motorcycle crash. I did want to acknowledge in the front row that Tashira's mother and sister both came so they could be here to watch these proceedings today. Our issue, real quickly, I think it's laid out in the briefs. We do believe that the policy is at best ambiguous, which is reflected by the fact that USAA's own legal department concluded there was coverage. They offered the $100,000 unconditionally when we got into the case. We got into the case a year, year and a half after the settlement opportunities were already gone. And so the idea that you could not raise an exclusion until three and a half years after the accident, and one that you didn't raise before, you know, it's just contrary to every Colorado case there is. And the Lyra case, I did want to say, is a completely different animal. Because the Lyra case, which says an insurance company doesn't have an obligation to consider punitive damages. Counsel, could I just?  Time is short, so let's focus in a little on a question. Your brief indicates that the common law bad faith claim is based on the company's failure to settle, and then of course the resulting excess judgment. Is that an accurate statement of your argument? Well, I don't believe that encompasses all of our argument. The investigation and the lack of one. Where did you talk about that? It's talked about throughout all of the briefs. Where in your brief did you say that? Because most, everything in your brief is about the settlement. We talked about the investigation, Your Honor, and forgive me, I do want to give the time back to Ms. Cortez. Well, this is a question that I think we need to have. It's in the brief. He did not investigate the question of ownership, Your Honor. He didn't investigate it, and then when he was told it, this is Todd Ellis, he was told he doesn't own his vehicle. If you can't pinpoint where it is, then we need to move on. The appellees say that you cite no authority that holds an insurer owes a duty to settle a non-covered claim, and I'm just quoting from their brief on that. Is that true? No authority that a duty, that's a red herring because the. You cite no authority that holds an insurer owes a duty to settle a non-covered claim. I would agree with that, and it is a red herring that doesn't mean anything,  Well, if you have a non-covered claim, then what happens to the argument? Insurance companies settle claims every day without knowing that they're gonna be covered, Your Honor. You're not listening to the question. Assume the claim is non-covered. Is there a duty to settle, and do you have any authority for that? If you can assume it's non-covered, which they could not do, so I reject that article, I agree. I'm asking you, counsel, counsel, you don't disagree with the question. No, I just agree with it. Okay, what's the answer? Is there a duty to settle a non-covered claim under Colorado law? If that claim is non-covered, and that's been determined, or you properly and timely reserve your rights. I wanna understand the timeframe. When is the duty, when does the duty attach in the context of the settlement situation? I mean, if the claim absolutely is not covered, that's one thing, but at the time that they rejected the offer to settle, if the knowledge they had did not indicate it was not covered, what is the implication of that for Colorado law? What Colorado says, by statute, and from the Trimble case forward, in every single case, including the Arellano versus Cruz case that I attached as supplemental authority in every single case, the question is, would a reasonable insurer act this way, and if not, did it cause damage? Act this way when, is what I'm saying. Is timing, does timing matter? Timing's everything, yes. And when it comes to this. Is everything for purposes of law? When it comes to this, timing is absolutely everything. That's why we have rules about raising affirmative, or raising coverage defenses within a reasonable time. It's to prevent this very case of what happened. I don't think anyone should be okay with what happened and excuse what happened here, and I think it's sad. Thank you. All right. Case's counsel will hear from you. May it please the court. Jeremy Moseley on behalf of Appalese Garrison and USAA. This case is about two auto policies that plainly exclude coverage for a motorcycle. As you heard, it is undisputed that exclusion B1 in the policy excludes coverage for a motorcycle. Clarify for me, Mr. Moseley, however, what this question that I was trying to tease out relative to the common law of bad faith claim. At the time that Miss Abeyta sought to settle, at the time that those settlement conversations were going on, it's my understanding that the light of B1 had not shown itself in this case in terms of its ability to exclude coverage. So my question is, when do you judge this duty of common law of bad faith? And to put a finer point on it, if at point A, discussions occur in which somebody says, I'm ready to settle, and it's unclear or it appears that there may be coverage and the insurer denies it. Point B, a year down the road, the insurer knows that there is not coverage. When do you judge their common law of bad faith? Generally speaking, Colorado law says that you judge their conduct based on what was available at the time. But you still have to have a duty that arises. And if there's no covered claim, there's no duty to settle. You judge their conduct, you judge their, well, I'm talking about the duty now to act, to settle. And what I'm saying is, do you measure the duty by what they knew at the time? That's what I understood you to say. And if that's true, what did you know at the time that this settlement was going on that would have allowed you to, in good faith, deny coverage, I mean, deny the settlement? So a few things. First of all, there's a difference between whether a duty arises and if there is a duty, how that's measured. So that's why I say that the good faith, how your conduct is measured, is measured based on what you knew at the time for the claim, but the duty doesn't arise if there was no coverage at all. So that's the distinction that matters first under Colorado law. Does that mean that no matter what the conduct, at point A, as Judge Holmes said, and then later, it's determined that there's no coverage, is that just retroactive? It wipes away any, what would otherwise have been bad faith? Is that the position? It depends on the damages alleged. There still have to be damages flowing from that alleged bad faith conduct. There is a claim that there are damages, and Judge Heil stated more elegantly than I could, that's the point. Does it retroactively, the fact that you later learn there's coverage, does it retroactively, let's assume that you acted in bad faith. I'm not making a judgment on that. Let's assume you acted in bad faith at point A, and we later find out there was not coverage at point B. Are you absolved from that bad faith at point A? If the only damages alleged are a failure to settle, and there was never a duty to settle, then there is no actionable conduct that can be tied to the damages being claimed. Well, I think they're claiming damages. But the only damages they're claiming is an alleged failure to settle, and there was never a duty to settle because there was never coverage. No, no, no, no, no, no. The coverage issue, I thought, we were talking about as being discreet, the question of whether you ultimately had to settle, okay, well, whether there was ultimately coverage. You're saying that in that moment in time, when that settlement conversation was going on, if, why could that, why could the argument not be that you acted unreasonably in that moment in time and not settling based upon what you knew at that time? At the time, first of all, because you also asked this as well, what is the evidence? And volume six, page 1045 in the record and around there, there are the letters that USAA sent and Garrison sent saying from the outset that there was no coverage. And because there was no coverage, they would not pay the claim. They say that this motorcycle is not insured by USAA or Garrison. They said that in the letter. When did those letters arise? I mean, is this after the lawyer communicated the information about B-1? What are we talking about now? We're talking about from the beginning, October of 2019, when Horton, pardon me, Abeyta's counsel first raised a claim. The response was to say, our position is there is no coverage. Right, but why did they say there was no coverage at that time? It wasn't because of B-1. They did not cite specifically to B-1. They said B-2 or B-3, right? They cited to, well, first of all, their initial was to talk about potential UIM coverage based on the other driver's liability. They also then said, even for liability coverage, it wouldn't be covered because it's not listed, it's not insured under these policies. And they subsequently cited to B-2 and talked about ownership, which ultimately correctly applied to one policy, the USAA policy, and not to the Garrison policy. Let me ask my same question with regard to Judge Mathis's question, because I ask it in the context of a duty to settle, so to speak. But let's just say that there's no reasonable investigation. It's just not done, for whatever reason. Or it was sloppy. And then later, years later, you find out that there's no coverage based upon an issue that was really never raised. Does that retroactively wipe away any problems with the failure to investigate? It depends on the damages alleged. Because the duty investigated is a separate duty, right? Yes, but it rises out of the contract. What's your position on whether the claimant preserved the failure to investigate claim? Is that an issue here? It's not, because what they've raised instead is focused on the duty, failure to settle. And here's the key. In the abstract, can there be? Could I just jump in, because I've got a follow-up on that answer. Do you say anything about waiving that issue in your brief? Well, no, we argued instead what they focused on. Their brief focused on failure to settle, so we responded to that. Yeah, but did you address the unreasonable investigation question in your brief? What we've addressed, and this is what ties it all together, is the damages being alleged. It's not enough to just say it was damage. You have to say, what are your damages? They did here. It's undisputed. Their only damages are the excess verdict that flows from a failure to settle. Here's what matters. Horton is the insured who the duty was owed to if any duty was owed previously in the claims handling. Horton testified that if he had been consulted about those demands being made, he did not have the money to make that claim, or to make that payment. He also testified he would have simply told Garrison or USAA that they should make the payment. What that turns back to is he's telling them that they should have made a payment for an uncovered claim. I'm just asking you what you put in your brief, okay? Did you argue against any claim for unreasonable investigation? Counsel says it's all over, that it's all preserved, and my question, I think you just answered that you don't think it is, but did you waive the waiver by addressing it in your brief? No, because what we addressed in our brief was what they raised, and that's what I'm trying to put together, is the focus entirely of their arguments. Is the failure settled? I think you've answered the question. Thank you. And what I'm struggling to understand is why could not damages flow from the failure to settle? And if your answer is because there was no coverage, that seems a very incomplete answer. I mean, if the issue is that there was an excess judgment as a result of your failure to settle based upon the information you knew at the time, and let's just pause it, assume that you were unreasonable and not settling at that point in time, and because you didn't settle at that point in time, what we ended up with was an excess judgment, why couldn't damages flow from that excess judgment? Because the duty to settle arises from indemnity, and if there is no coverage, there is no duty to settle. That's the principle that the LERA court, the Colorado Supreme Court and LERA v. Shelter made very clear in distinguishing between compensatory damages in that case that were covered and punitive damages that were not covered. What the court said is this. If the insurer has no contractual duty to indemnify the insured for punitive damages, the insurer has no tort duty to settle in good faith with regard to those damages. Did this answer to Chief Judge Holmes in effect saying it didn't matter what they knew about coverage during this settlement, this key settlement period? All that matters is whether there in fact was coverage? On the issue for a duty to settle, correct. It doesn't matter what was known then because you have to have the duty that arises before you apply the test of whether there's bad faith. The duty does not arise on a claim to settle that claim when it's a non-covered claim. And what was known at the time was that it was a motorcycle. Ownership was initially questioned. So this may be a hypothetical, but let's say during the settlement period, the company thought there was coverage even though under the policy maybe there wasn't. Let's assume there wasn't. Once you look at the policy and study it, and we can argue the exclusion, the exceptions and all that. But let's say that at the time they thought there was coverage and then didn't settle and then we have the excess judgment. Are you saying that doesn't matter? What really matters is just whether there was coverage? When we're talking about a duty to settle, that is correct. What matters is whether there's coverage. That's what Lyra says. No duty to settle arises from uncovered damages. Is your answer the same with regard to the duty to investigate though? Is your answer the same if there's no coverage, then that retroactively wipes away any breach of a duty to investigate? It depends on what damages are then alleged. And that's why I referred to what Horton actually said. So your answer is different on that. But you still have to show damages. But your answer is if there's no coverage at the end that doesn't wipe away your obligation to investigate reasonably. Is that correct? That's correct. But you then have to show what actual damages are tied to that. So what would be recoverable damages and why weren't there recoverable damages here? Well, for example, when you have a non-covered claim, this is why Horton's testimony matters. It's one thing if Horton said, had I known about that offer at the time to which you were saying there was no coverage, I would have paid that claim. I would have entered that settlement. There are other courts and other states that apply that standard. If there's no coverage early on because they investigate it and they show that there's no coverage, the case probably doesn't even go to trial, right? Well, not true because they actually did investigate it. They said there was no coverage and they kept coming back. I mean, no coverage on exclusion B-1. Well, that's, I mean, we're hearing today that that's not even true because the other sections provide coverage. They were sent a copy of the policy in the middle of this, the liability section of the policy, and they still proceeded with making this claim. What about these internal documents in the record where adjusters or counsel or whatever says there was coverage? What do we do with that? Well, I mean, first of all, that's evidence that isn't relative to what their actual damages being claimed are that tie back to the fact that there had to be a duty to settle for us to pay benefits first. The second thing is those specific documents were asking a single question. Does B-2 apply? They weren't even addressing B-1 in those documents. There are other documents that address B-1 where the adjuster went and got a coverage opinion and then after asking about B-1 issued the reservation of rights letter. So they're being overread to claim that that meant there was coverage under the policy. Asking about B-1. I thought that B-1 surfaced because the lawyer told them about B-1. No, I mean, Wheeler-Trigg, that lawyer. Oh, no, no. Actually, the timing of that is incorrect. They had previously, before Wheeler-Trigg was involved, already started, had already requested coverage opinion from a different law firm, Sweet Mom and Sam's. So while that's what Abeyta claims in the record, that's not what's supported by the facts. Page, volume 12, page 1806, you'll see Wendy Boyd testifies that earlier in August they were already requesting this coverage opinion completely separate from Wheeler-Trigg because Wheeler-Trigg's on defense and they weren't looking to them for coverage at all. They were looking to a coverage firm. Yeah, but did you find, was the first information you received about B-1 from Wheeler-Trigg? No, it was not. Let me ask you a question that. And it can't have been because of the timing. I understand this is a difficult question. But what is your position or your client's position on whether or not the claim was initially properly and reasonably investigated? What is your position on that? That it was properly and reasonably investigated and determined there was no coverage and that held up, that there was no coverage. And Colorado Law is also clear that you can't create coverage later. Whether the claim was properly investigated and timely investigated with regard to the reason there was no coverage, meaning ultimately B-1. What's your position on that? From the outset, the letter said it was not covered as a result of not being insured under the policy and not being listed on the policy. And that is part of what B-1 says too. I believe that there was sufficient information presented from the beginning as to what the ultimate coverage exclusion used that applies is. And because Colorado Law is clear that you can't create coverage by estoppel, that same idea still applies that just because you mention one exclusion and don't mention all the others that could also apply doesn't mean you can't raise them later and it doesn't mean you acted in bad faith by doing that either. Well, didn't things go off track because there was a mistaken understanding that Nicholas owned the motorcycle and not the dad? That was one thing that he was relying on the adjuster and focusing on that exclusion when ultimately it applies to one policy and not the other. Why isn't that relevant to whether the investigation was reasonable? Because the only damages that have been alleged as a result of that are to say we should have gone ahead and paid a claim that was not covered. It's not tied to any other conduct and damages. That's the fundamental problem that the district court recognized and that's why it should be affirmed. Thank you. 30 seconds. Your Honor, there was an issue about the Wheeler-Trig opinion and that goes back to the reliance question. There was reliance from Mr. Horton because he relied on retained defense counsel to act in his best interest when they went behind his back and issued this coverage opinion adverse to his interests. He said he wouldn't have done anything differently though, didn't he? Your Honor. What would he have done differently? He had no intention of doing anything differently. He had no right to handle the claim. If he would have been able to handle the claim, maybe he would have been able to do something differently, but he had no right to handle the claim and so that's boxing him in on a legal argument. He couldn't pursue that avenue. And one last thing. I thought you were gonna answer the question. Do your damages stem from anything other than a failure to settle? Your Honor, our damages stem from the unreasonable conduct, the excess judgment, which is prejudiced as a matter of law. And it relates to the failure to settle, right? And it relates to emotional distress, having to go through the underlying trial. The emotional distress from the deck action. The reason why we're in this deck action is because Wheeler Trigg issued that opinion adverse to his interests. And the last point is, there was a letter that USA and Garrison sent to Horton right after he was sued affirming coverage under the policy which he did rely on that there was coverage. Chief, may I ask another question? I'm gonna ask you the same question I ask opposing counsel. So basically I said, well, if they would have asserted B-1 initially, maybe the case doesn't go to trial. But your position sounds like it would have went to trial anyway if they didn't settle. Because you would have taken the position that you're taking now, that there was coverage under the exception to exclusions B-2 and B-3, right? And let me make sure I understand the question. If they would have properly raised B-1, would have it gone to trial? Well, would you have said, wait a minute, there's no coverage? I mean, the case goes away essentially. I think Horton would have informed in beta the insurance companies are saying there's no coverage. Well, that's what they were saying. But what would the position on the other side have been? Well, there's still coverage under B-2 and B-3? I think it raises a reasonable coverage dispute. And then there's a question from a beta whether to even pursue the claim. Because this accident happened in 2018. Mr. Horton has been fighting this since 2018. And it's taken years of his life. And there needs to be an analysis. And there is an analysis by plaintiff's attorneys. Would this be reasonable to pursue this? And in this case, we've been told they wouldn't have pursued it because it would have been a protracted fight. But since they denied it on a false basis, a beta thought, oh, there's definitely coverage. We're gonna file suit against Horton. And Horton got roped into this. Thank you for your time, your honors. Thank you. Well, and I know there's some family members here. And I know this is all hard to hear. And I know it's a terrible tragedy under any circumstances. But I'm sorry for your loss. We're looking at this on legal issues. And that doesn't impact your loss either way. I understand that. So let me just say that. Okay, thank you. Case is submitted. Thank you, counsel. And we'll take our 10-minute break now.